IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

UNITED STATES OF AMERICA,

v.  Case No. 2:16cr57

MARLON LEWIS DAYE,

       Defendant.

## POSITION OF THE DEFENDANT WITH RESPECT TO SENTENCING FACTORS

COMES NOW the Defendant, MARLON LEWIS DAYE, by counsel, in accordance with Rule 32 of the Federal Rules of Criminal Procedure, Section 6A1.2 of the <u>Sentencing Guidelines and Policy Statements</u> as well as this Court's sentencing Order, and hereby represents that the Defendant has reviewed the Probation Office's Pre-Sentence Report and that he has no objections[1] to the report and states his position with respect to sentencing factors.

## THE APPROPRIATE SENTENCE IN THIS CASE

For a span of approximately seven years, Marlon Lewis Daye sold drugs to support his family and to supplement his landscaping business. He was not involved in any acts of violence and did not enjoy a lavish lifestyle. Additionally, he does not have an extensive criminal history and has never before been sentenced to an active period of incarceration. Accordingly, a sentence of 120 months imprisonment, the mandatory minimum, would be the appropriate sentence in this case. The overriding principle and basic mandate of § 3553(a) requires district courts to impose a sentence "sufficient, but not greater than necessary," to comply with the purposes of sentencing set forth in § 3553(a)(2). The "sufficient but not greater than necessary" requirement is not just

---

[1] The defense previously noted objections to the PSR/guideline range to the probation officer but those objections are not being pursued and are withdrawn.

another factor to be considered along with those set forth in § 3553(a), but instead sets an independent limit on the sentence.

Accordingly, the law must "tak[e] into account the real conduct and circumstances involved in sentencing," *Gall v. United States*, 552 U.S. 38, 54 (2007), as well as the defendant's personal history and characteristics, 18 U.S.C. § 3553(a)(1). Since the guidelines cannot do this, the Court must do so, i.e., "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Id.* at 52. None of the sentencing factors are to be given greater weight than the other factors.

## Nature and Circumstances of the Offense

The offense is Conspiracy to Manufacture, Distribute and Possess with Intent to Distribute One Kilogram or More of Heroin. The "offense conduct" section of the Presentence Report ("PSR") and the Statement of Facts sets forth the facts and circumstances of the offense and Mr. Daye's activities. Essentially over an approximate seven year period, Mr. Daye sold heroin and in some instances, cocaine. While this is a lengthy period of time, Mr. Daye did not consistently – month after month – sell drugs. There were times when he did not sell at all and his involvement certainly had its ups and downs. As his lawn business grew, his reliance on the need to sell drugs for money decreased. To be sure, he continued to sell drugs at times to make ends meet the past couple of years but his involvement was not the same level as in years past. Mr. Daye was not involved in any acts of violence nor did he ever threaten or intimidate anyone. In any event, Mr. Daye knows he was wrong and foolish to continue his involvement with drug trafficking. He will pay a very heavy price for his actions.

## History and Characteristics of Mr. Daye

Mr. Daye is a twenty-eight year-old father of a sixteen-month old, and step-father to two young children of his long term girlfriend, Larette King. He was raised by both of his parents, Jesse and Donita Daye, in Portsmouth, Virginia until he was about eight years old, and then in Chesapeake, Virginia. His parents were married and lived together until Mr. Daye was about twenty-five years old. After their separation and ultimate divorce, Mr. Daye continued to live with his father in Chesapeake. He lived in a loving, supportive home without drugs or excessive use of alcohol and attended church on a weekly basis. Mr. Daye's basic needs were met and he always felt loved and supported by his parents.

Despite this supportive, structured home life, Mr. Daye was exposed to underage use of alcohol and illegal drugs in his neighborhood. This exposure and ultimate experimentation caused him some degree of difficulty for most of his adult life. He became addicted to alcohol at a young age, first trying it at age fourteen, and quickly using it to excess for nine years. At that time, he reduced his consumption to every other day, however relapsed back to heavier use when he was about twenty-four or twenty-five years old. Mr. Daye has used marijuana since age fourteen as well, and used heroin from age twenty-five up until a week before his arrest. These substance abuse issues have plagued him for years. However, to his credit, during his incarceration at the Western Tidewater Regional Jail, he has attended a substance abuse treatment program which he completed on June 14, 2016. Mr. Daye enjoyed attending the classes and believes they have helped him a great deal.

Mr. Daye attended Deep Creek High School in Chesapeake. He left while in the tenth grade, but eventually earned his high school diploma elsewhere. He also took some college courses at Tidewater Community College in the field of welding on two separate occasions and

excelled. He has also completed two out of the three classes to obtain his contractor's license in Virginia Beach. He has not completed college, nor has he obtained any professional licenses, but hopes to do both while incarcerated so that he can be more employable and productive when he is released from prison.

Mr. Daye has been employed throughout most of his adult life. Since 2008, he has been the owner and operator of a landscaping business called "Precision Landscapes." This business provided landscaping services to the residents of Chesapeake and throughout Hampton Roads. He is a highly skilled landscaper and had many satisfied customers. Mr. Daye was very proud of the work his company did throughout those years. Additionally, prior to 2007, he worked on and off at the Newport News Shipyard through a temporary agency and at various construction and concrete jobs.

Despite his involvement in this drug conspiracy, at the time of his arrest, it should be noted that Mr. Daye did not have many assets to his name, nor did his business have fancy, expensive landscaping equipment. Instead, Mr. Daye is in considerable debt (the PSR shows a negative net worth of $31,126.00) and most of Mr. Daye's business equipment was bought second-hand off of websites like Craigslist. He lived a non-lavish lifestyle with his father and did not have expensive vehicles or homes. In short, despite the extensive nature of the conspiracy, Mr. Daye did not sell drugs to become rich, nor did he ever become rich. Further, while it does not justify or take away from his responsibility for all of his actions, Mr. Daye's drug trafficking activities scaled back considerably in the past few years. At the time of his arrest, he was found with 30 grams of heroin and 24 grams of cocaine in his possession (in a shed at his residence). From October 16, 2015 until January 20, 2016, seven controlled buys yielded approximately 112 grams of heroin and 14 grams of cocaine. While still illegal and not insignificant, these quantities are in nowhere near the

same league as what he was selling back in previous years. He did his best to leave the drug dealing behind him, however, unfortunately Mr. Daye still sold periodically to supplement his income and support his family.

Mr. Daye has the love and support of all of his family, but none greater than his father, Jesse Daye. He has lived with his father his entire life and they have a strong bond. This case has caused a great deal of stress on Mr. Jesse Daye and he looks forward to his son being able to put this matter behind him and return home. He welcomes him back to his home as soon as he is released from prison.

Marlon Daye also has the support and love of his long-term partner and girlfriend, Larette King. She reports that he has been a good father figure to her two young children, and a great father to their child in the short time he was home before his incarceration. She describes him as a "good provider" and a "good person." Mr. Daye loves all three of these children dearly, and looks forward to being able to put this case behind him so that he can begin to (lawfully) provide for them once again. He is devastated that his actions will cause him to miss at least the first ten years of his child's life, but he intends to stay in touch through visits and letters as much as possible.

## Seriousness of the Offense/Promoting Respecting for the Law/ Providing Just Punishment

A sentence of 120 months imprisonment would reflect the seriousness of the offense, promote respect for the law and provide just punishment to Mr. Daye. Despite being in Criminal History Category III, Mr. Daye has a fairly minimal criminal record of one juvenile conviction, one traffic matter, and one non-violent felony conviction. Additionally, and of great significance, he has never been sentenced to an active term of incarceration. For his one juvenile conviction

that occurred when he was fifteen years old (he was sentenced when he was seventeen years old), Mr. Daye received twelve-months of unsupervised probation. At age twenty-six, he was convicted for making a false statement on a firearms form. He received two years of imprisonment, suspended upon condition of one year of probation and good behavior.

Ten years imprisonment will go more than far enough in promoting respect for the law, providing just punishment, and reflecting the seriousness of the offense. Mr. Daye has never been to prison before and therefore any sentence, even the mandatory minimum sentence of ten years, is a substantial sentence. Also, following his release from prison, Mr. Daye will be on a period of supervised release for at least five years with the probation office of this Court. While the probation office will be a source of structure to Mr. Daye and will be a resource for him, supervised release will still be a restriction on his liberty - and thus continued punishment. The minimum of ten years imprisonment followed by a period of supervised release of at least five years is a substantial punishment and will send a strong message to Mr. Daye and to the community that his actions are unacceptable and have consequences, without being greater than necessary to accomplish all of the goals 18 U.S.C. § 3553(a).

**Affording Adequate Deterrence and Protecting the Public from Mr. Daye**

A sentence of 120 months will also afford adequate deterrence to Mr. Daye and others contemplating engaging in similar conduct. The period of confinement suggested by the Guidelines is greater than necessary to ensure that Mr. Daye learns his lesson. "Generally, a lesser period of imprisonment is required to deter a defendant who was not previously subject to lengthy incarceration, than is necessary to deter a defendant who has already served serious time yet continues to re-offend." *United States v. Qualls*, 373 F.Supp.2d 873, 877 (E.D. Wis. 2005). Thus,

the sentence requested is sufficient for Mr. Daye to "get the message" that he cannot engage in this sort of behavior upon his release from prison.

The offense is very serious, but not likely to be repeated by Mr. Daye because of the seriousness of the punishment that is required by law. Thus, a sentence of 120 months imprisonment also satisfies the factor of protecting the public from Mr. Daye.

## **Providing Needed Educational/Vocational Training/Medical Care/ Correctional Treatment**

Mr. Daye graduated from high school and has taken a few classes at the Community College level, but very much wishes to complete his college education and obtain further professional licenses to assist him in his field upon his release from prison. Mr. Daye has completed part of the requirements of both schooling and licensing, but hopes to complete both while incarcerated. Mr. Daye respectfully requests that the Court recommend that he be allowed to take advantage of the Bureau of Prisons' vocational training and educational opportunities.

In addition, Mr. Daye has struggled with the use of heroin, marijuana, and alcohol starting as young as age fourteen. Although he completed a drug treatment program while at the Western Tidewater Regional Jail, Mr. Daye could still benefit from the Bureau of Prisons' 500 hour residential drug treatment program, even though he will not receive the benefit of the sentence reductions under the current laws. Regardless, Mr. Daye respectfully requests that the Court recommend to the Bureau of Prisons that he be placed in this program while incarcerated.

The sentence sought by the defense is sufficient to provide Mr. Daye with needed educational and vocational training as well as drug treatment and counseling.

## Kinds of Sentences Available/Sentencing Range/Guideline Policies and Overstatement of Criminal History

Count One has a statutory range of punishment of ten (10) years to life imprisonment and at least five (5) years of supervised release. The guideline range recommends a term of incarceration of 262 to 327 months. Of course, this guideline range is advisory.

Mr. Daye has been placed in Criminal History Category III by the probation officer. This is based on a total of four criminal history points being assessed against Mr. Daye for the following convictions: related juvenile offenses of manufacture, distribute or possess with intent to distribute a controlled substance, carrying a concealed weapon and distribution of marijuana (one sentencing event) and false statement on criminal history consent form as an adult. He was assessed one criminal history point for each of these convictions. The juvenile offenses are just barely countable for criminal history category purposes as they are just within the five year window which makes them count pursuant to U.S.S.G. § 4A1.2(d)(B). Mr. Daye's adult conviction resulted in a two year suspended sentence conditioned on one year of good behavior. Mr. Daye appealed this conviction. In any event, for this conviction, Mr. Daye also received two criminal history points for committing the instant offense while on "good behavior."

Mr. Daye requests that the Court grant him a downward departure for over-representation of his criminal history. U.S.S.G. § 4A1.3(b)(1) provides the standard for downward departures based on an over-stated criminal history. It states: "If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted." The fact that a defendant's criminal history category overstates the seriousness of his actual criminal history is a well-recognized basis for downward

departure. *United States v. Hall*, 977 F.2d 861, 866 (4th Cir. 1992) (recognizing that overstatement of a defendant's criminal history may be a proper basis for a downward departure); *United States v. Summers*, 893 F.2d 63, 67 (4th Cir. 1990) (affirming downward departure based on criminal history). As the Fourth Circuit explained in *United States v. Atkins*, 937 F.2d 947 (4th Cir. 1991):

> "Criminal history" is, relatively, one of the most flexible concepts in the guidelines. While it is possible to classify the severity of current federal offenses with a reasonable degree of precision, mathematically accurate evaluation of the countless possible permutations of criminal history, involving offenses high and petty committed in numerous jurisdictions, would be at best unwieldy. The Sentencing Commission recognized this difficulty, and though it prescribed a mathematical method to calculate criminal history, it specifically identified overstatement or understatement of the seriousness of the defendant's past conduct as a ground for departure from the raw criminal history score.

Atkins, 937 F.2d at 952; *accord Summers*, 893 F.2d at 67. In *Summers*, for example, the Fourth Circuit affirmed a downward departure on the ground that the defendant's criminal history category overstated the severity of the defendant's criminal history, which included "convictions for grand larcenies, possession of narcotics, a weapons violation, driving with a suspended license violations, and probation revocation." 893 F.2d at 65, 68 (approving the exclusion of the defendant's driving offenses from the determination of the criminal history category). Similarly, in *United States v. Nelson*, 166 F. Supp.2d 1091 (E.D. Va. 2001), the District Court granted a horizontal departure from CHC VI to CHC III where the defendant's criminal history score was "derived primarily from motor vehicle offenses and convictions for minor offenses." *Id.* at 1093.

Mr. Daye has been placed in a Criminal History Category III based on a juvenile offense committed over ten years ago and a non-violent adult conviction for which he received a two year suspended sentence. He has accumulated enough criminal history points for his present category but has never before been incarcerated. Now he faces a mandatory minimum sentence of ten years in prison. For these reasons, the defense respectfully suggests that Criminal History Category II is a more accurate description of the seriousness of Mr. Daye's criminal history.

## Unwarranted Sentencing Disparity

The factor of avoiding unwarranted sentencing disparity encourages guideline sentences and thus has the practical effect of improperly elevating this sentencing factor over the other factors of § 3553(a). This factor was one of the driving reasons behind the adoption of the Guidelines. While unwarranted sentencing disparity is a laudable goal, strict adherence to the Guidelines shifts the focus away from the individual defendant being sentenced. Moreover, strict adherence to this particular factor results in the guidelines being *de facto* mandatory.

The defense acknowledges that its request for a ten year sentence is significantly below the guideline range. Despite being a below guidelines sentence, the sentence requested by the defense would not result in significant sentencing disparity. Courts have noted that a departure from guideline sentences do not need to be supported by unusual circumstances, as a pre-Booker departure would; rather all that is necessary is "an adequate statement of the judge's reasons, consistent with section 3553(a), for thinking the sentence that he has selected is indeed appropriate for the particular defendant." *United States v. Castro-Juarez*, 425 F.3d 430, 436 (7th Cir. 2005) (citing *United States v. Dean*, 414 F.3d 725, 729 (7th Cir. 2005)).

A sentence within the guideline range is greater than necessary in this particular case. In its sentencing pleading the Government points to the sentences imposed in the prosecution of the "Outten Organization" in this Court. Most of those defendants had significant criminal histories especially when compared to Mr. Daye. In addition, Mr. Daye was not a member of that "organization" or conspiracy. Moreover, Mr. Daye did not operate like the "Outten Organization" members did. In this regard, Mr. Daye was more of a "lone wolf" when it came to drug trafficking and did not participate in acts of violence. Given Mr. Daye's personal history and characteristics, his limited criminal history, no prior incarcerations, that the offense did not involve acts or

threatened acts of intimidation or violence, that Mr. Daye was moving away from selling drugs, and the excessive guideline range, a sentence of ten years imprisonment is more appropriate than a guideline sentence and sufficiently addresses all of the sentencing factors.

**Conclusion**

For the reasons advanced above, the defense respectfully moves for a sentence of 120 months imprisonment. Such a sentence is sufficient to comply with the factors set forth in 18 U.S.C. § 3553(a). The defense also respectfully requests that the Court recommend to the Bureau of Prisons that Mr. Daye be placed in the 500 hour residential drug treatment program (RDAP), that he be allowed to participate in vocational and educational programs, and that he be incarcerated in a prison as close to this area as possible.

Respectfully submitted,
**MARLON LEWIS DAYE**
By          /s/

Keith Loren Kimball, Esquire
VSB # 31046
Supervisory Assistant Federal Public Defender
Attorney for Marlon Lewis Daye
Office of the Federal Public Defender
150 Boush Street, Suite 403
Norfolk, Virginia 23510
Telephone: (757) 457-0870
Telefax: (757) 457-0880
Email: keith_kimball@fd.org

Amanda C. Conner, Esquire
VSB # 88317
Assistant Federal Public Defender
Attorney for Marlon Lewis Daye
Office of the Federal Public Defender
150 Boush Street, Suite 403
Norfolk, Virginia 23510
Telephone: (757) 457-0800
Telefax: (757) 457-0880
Email: amanda_conner@fd.org

# CERTIFICATE OF SERVICE

I certify that on this 20th day of September, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification (NEF) to:

John F. Butler, Esquire
Special Assistant United States Attorney
Office of the United States Attorney
101 W. Main Street, Suite 8000
Norfolk, Virginia 23510
Email: john.f.butler@usdoj.gov

And I hereby certify that I have electronically mailed and mailed the document by U.S. Mail to the following non-filing user:

Jason D. Cole
Senior United States Probation Officer
600 Granby Street, Suite 200
Norfolk, Virginia 23510
Email: Jason_Cole@vaep.uscourts.gov

                                                /s/
Keith Loren Kimball
VSB No. 31046
Attorney for Defendant Marlon Lewis Daye
Supervisory Assistant Federal Public Defender
Office of the Federal Public Defender
150 Boush Street, Suite 403
Norfolk, Virginia 23510
Telephone: 757-457-0870
Telefax: 757-457-0880
Email: keith_kimball@fd.org